In re LIVE CONCERT ANTITRUST LITIGATION.

This Document Relates to:

Lauren J. Hammer V. Clear Channel Communications, Inc. et al., 2:06–CV–04987 SVW (VBK)

Margaret A. Thompson V. Clear Channel Communications, Inc. et al., 2:05–CV–06704 SVW (VBK).

Case No. 06–ML–1745–SVW (VBK).

United States District Court, C.D. California.

March 23, 2012.

Elaine T. Byszewski, Lee M. Gordon, Leo D. Caseria, Hagens Berman LLP, Los Angeles, CA, George W. Sampson, Steve W. Berman, Tyler S. Weaver, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Jennifer Fountain Connolly, Hagens Berman Sobol Shapiro LLP, Washington, DC, Kenneth A Wexler, Wexler Wallace LLP, Chicago, IL, Timothy N. Mathews, Chimicles & Tikellis LLP, Haverford, PA, Elizabeth A. Fegan, Hagens Berman Sobol Shapiro LLP, Oak Park, IL, Mark R. Miller, for Plaintiffs.

Chul Pak, Jonathan M. Jacobson, Lucy Yen, Wilson Sonsini Goodrich & Rosati, New York, NY, Leo D. Caseria, Heller Ehrman, Theodore J. Boutrous, Jr., Steven E. Sletten, Gibson Dunn & Crutcher LLP, Harvey I. Saferstein, Nada I. Shamonki, Sarah Jane Robertson, Mintz Levin Cohn Ferris Glovsky and Popeo PC, Los Angeles, CA, Colleen Bal, Wilson Sonsini Goodrich & Rosati, San Francisco, CA, for Defendant.

Daniel J. Kurowski, Elizabeth A. Fegan, Hagens Berman Sobol Shapiro LLP, Oak Park, IL, Hollis L. Salzman, Labaton Sucharow LLP, Jonathan M. Jacobson, Wilson Sonsini Goodrich and Rosati, Lee Squitieri, Squitieri and Fearon LLP, New York, NY, Jeffrey L. Kodroff, E. Kopp, Spector Roseman & Kodroff, Philadelphia, PA, Jennifer Fountain Connolly, Hagens Berman Sobol Shapiro LLP, Renata Hesse, Wilson Sonsini Goodrich and Rosati, Washington, DC, Joseph G. Sauder, Nicholas E. Chimicles, Timothy N. Mathews, Kimberly M. Donaldson, Chimicles & Tikellis, Haverford, PA, Lance August Harke, Harke Clasby & Bushman LLP, Miami Shores, FL, Lee M. Gordon, Hagens Berman Sobol Shapiro LLP, Pasadena, CA, Mark R. Miller, Wexler Wallace LLP, Chicago, IL, Colleen Bal, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Live Concert Antitrust Litigation.

## ORDER RE:

### DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. OWEN R. PHILLIPS [403]

### DEFENDANTS' MOTION FOR CLASS DECERTIFICATION [410]

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DENVER ACTION) [438]

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (LOS ANGELES ACTION) [441]

### PLAINTIFFS' MOTION FOR APPROVAL OF PLAN FOR CLASS NOTICE, TO ORDER DEFENDANTS TO PRODUCE CLASS MEMBER INFORMATION, AND TO MODIFY THE CLASS DEFINITION [460]

### PLAINTIFFS' MOTION TO EXCLUDE THE "AFFINITY ANALYSIS" OF DR. JANUSZ ORDOVER [469]

### PLAINTIFFS' MOTION TO STRIKE DECLARATION OF JULIA VANDER PLOEG [516]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION AND PROCE-DURAL BACKGROUND[1]

On June 13, 2002, Malinda Heerwagen filed a putative class action in the United States District Court for the Southern District of New York, alleging claims of monopolization, attempted monopolization, and unjust enrichment against Clear Channel, Inc. and related entities. Heerwagen claimed that the defendants had engaged in anticompetitive conduct in connection with their nationwide promotion of live music concerts. On August 11, 2003, the district court denied Heerwagen's motion for class certification, concluding that the putative class's antitrust claims required a separate analysis for each relevant geographic market, and, therefore, certification of a *nationwide* class was unwarranted. The Second Circuit affirmed. *Heerwagen v. Clear Channel Commc'ns, Inc. et al.,* 435 F.3d 219 (2d Cir.2006). Heerwagen subsequently dismissed the case voluntarily.

Twenty-two regional putative class actions subsequently were filed against Clear Channel, Inc. and related entities, alleging substantively identical claims of: (1) Monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) Attempted Monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; and (3) Unjust Enrichment. These actions ultimately were consolidated and assigned to this Court as part of this Multi–District Litigation ("MDL").

On November 1, 2006, this Court issued an order staying discovery in every action except those in the following five geographic markets: Los Angeles, Chicago, New Jersey/New York, Boston, and Denver. (Dkt. 36, 37). On October 22, 2007, this Court issued an order certifying classes in these five markets and denying

Defendants' motion for judgment on the pleadings as to Plaintiffs' attempted monopolization claims. (Dkt. 160); *Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litiq.),* 247 F.R.D. 98 (C.D.Cal.2007).

On November 16, 2009, the Court denied Plaintiffs' motion for approval of plan for class notice, and further ordered that the action be stayed pending the Ninth Circuit's *en banc* decision in *Dukes v. Wal–Mart,* 509 F.3d 1168 (9th Cir.2007). (Dkt. 215). On October 7, 2010, the Court granted Defendants' motion to lift the stay, denied Defendants' motion for reconsideration based on the Ninth Circuit's decision in *Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571 (9th Cir.2010) (en banc), and ordered the parties to submit a joint stipulation as to how best to proceed with this action. (Dkt. 240).

Pursuant to the parties' stipulation, the Court entered an Order Regarding Scheduling of Action on December 10, 2010. (Dkt. 260) Under this stipulated order, the parties agreed to limit further discovery to the Denver and Los Angeles markets. "The remaining three certified template markets (Chicago, New York and Boston) shall be stayed until the Denver and Los Angeles markets are tried or otherwise resolved." (*Id.*).

On February 7, 2011, Defendants filed a Motion for Partial Summary Judgment Regarding Statute of Limitations (with respect to the Denver and Los Angeles actions). (Dkt. 271). On April 7, 2011, the Court granted the motion. (Dkt. 310).

The following motions are currently pending before the Court:

*Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.),* 247 F.R.D. 98 (C.D.Cal. 2007).

---

1. A more detailed factual and procedural history is set forth in this Court's October 22, 2007 Order Granting Plaintiffs' Motion for Class Certification. (Dkt. 160); *Thompson v.*

- Defendants' Motion to Exclude the Testimony of Dr. Owen R. Phillips, (Dkt. 403);
- Defendants' Motion for Class Decertification, (Dkt. 410);
- Defendants' Motion for Summary Judgment (Denver Action), (Dkt. 438);
- Defendants' Motion for Summary Judgment (Los Angeles Action), (Dkt. 441);
- Plaintiffs' Motion for Approval of Plan for Class Notice, to Order Defendants to Produce Class Member Information, and to Modify the Class Definition, (Dkt. 460); and
- Plaintiffs' Motion to Strike Declaration of Julia Vander Ploeg, (Dkt. 516).

For the reasons set forth below, Defendants' Motion to Exclude the Testimony of Dr. Owen R. Phillips, (Dkt. 403), is GRANTED IN PART. Defendants Motions for Summary Judgment, (Dkt. 438, 441), are GRANTED. The remaining motions are DISMISSED AS MOOT.

## II. PRIOR CLASS CERTIFICATION ORDER

As noted above, on October 22, 2007, the Court issued an Order Granting Plaintiffs' Motion for Class Certification (in the Chicago, Boston, New York/New Jersey, Denver, and Los Angeles markets). *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D.Cal.2007). At that time, however, the Court was bound by then-governing Ninth Circuit precedent, under which district courts were precluded from resolving factual disputes—and, in particular, weighing conflicting expert testimony—at the class certification stage. Thus, the Court concluded "*Dukes* [*v. Wal–Mart, Inc.*, 474 F.3d 1214, 1229 (9th Cir.2007) ] clearly precludes the Court from conducting a *Daubert* analysis or weighing expert testimony," *id.* at 116 n. 7, and effectively accepted as true, for purposes of that mo-

tion only, the representations of Plaintiffs' expert. "[T]his order views the allegations, expert testimony, and evidence through the very narrow prism permitted by *Dukes*. Accordingly, Plaintiffs have satisfied the requirements of Rule 23[.]" *Id.* at 155.

The original decision in *Dukes*, however, was subsequently withdrawn and replaced by *Dukes v. Wal–Mart Stores, Inc.*, 603 F.3d 571 (9th Cir.2010) (en banc), which was, in turn, reversed by the Supreme Court in *Wal–Mart Stores, Inc. v. Dukes*, — U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). In its decision, the Supreme Court enunciated a significantly different standard than that applied by this Court in its 2007 Class Certification Order. "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.... Frequently that 'rigorous analysis' will entail some overlap with the merits of the Plaintiffs' underlying claim. That cannot be helped." *Dukes*, 131 S.Ct. at 2551. The Court went on to observe, "The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so[.]" *Id.* at 2553–54.

In short, the Court's prior Order Granting Class Certification was based on a legal standard that is no longer in effect, which precluded the Court from undertaking a meaningful analysis of either the underlying facts of the case or the representations of the parties' respective experts. As such, that order has little to no precedential value at this point in the litigation. The Court is writing on a proverbial "clean slate."

## III. PENDING MOTIONS (ORDER OF ANALYSIS)

There are several motions currently pending before the Court, including: (1)

Defendants' motion to exclude the testimony of Plaintiff's expert Dr. Owen Phillips, pursuant to Federal Rule of Evidence 702; and (2) Defendants' motions for summary judgment as to the Denver and Los Angeles markets. These motions require two distinct inquiries. First, the Court must evaluate the admissibility of Dr. Phillips' proffered expert testimony in its role as "gatekeeper" under Rule 702. *See Claar v. Burlington N. R.R.*, 29 F.3d 499, 501 (9th Cir.1994) (prior to ruling on summary judgment motion, "[t]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. The primary locus of this obligation is Rule 702.") (emphasis in original) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

Second, the Court will evaluate the merits of Defendants' motions for summary judgment, considering Dr. Phillips' testimony only to the extent that it is admissible under Rule 702. *See generally id.* at 504–05 (affirming summary judgment based on the exclusion of testimony by plaintiffs' damages expert, holding: "To survive [defendant's] motion for summary judgment, plaintiffs were required to offer admissible expert testimony showing that exposure to chemicals in the workplace played some part in producing their injuries.").

## IV. DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. OWEN R. PHILLIPS

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal courts. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.[2]

"[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed.R.Evid. 702, Notes of Advisory Committee on 2000 amendments (citing *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

The admissibility of expert testimony is a question for the Court. Fed.R.Evid. 104(a); *Bourjaily*, 483 U.S. at 175–76, 107 S.Ct. 2775. To that end, the Supreme Court has recognized the obligation of the trial court to fulfill a "gatekeeping role" in order to "ensure that any and all [expert] testimony ... is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "The objective of that [gatekeeping] requirement is ... to make certain that an expert, whether bas-

**2.** Effective December 1, 2011, "[t]he language of Rule 702 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules.

These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility." Fed.R.Evid. 702, Notes of Advisory Committee on 2011 amendments.

ing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

With respect to the reliability of expert testimony, the Supreme Court in *Daubert* identified several factors that the court may consider when making its determination, including: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence, and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786; *accord Kumho,* 526 U.S. at 151, 119 S.Ct. 1167 (holding *Daubert* factors may be applied to non-scientific expert testimony, depending upon "the particular circumstances of the particular case at issue").

The Supreme Court has emphasized, however, that these factors are not exclusive, and that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho,* 526 U.S. at 142, 119 S.Ct. 1167 (emphasis in original). "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152, 119 S.Ct. 1167. Thus, the admissibility of expert testimony is "a subject peculiarly within the sound discretion of the trial judge, who alone must decide the qualifications of the expert on a given subject and the extent to which his opinions may be required.'" *United States v. Chang,* 207 F.3d 1169, 1172 (9th Cir.2000)

(quoting *Fineberg v. United States,* 393 F.2d 417, 421 (9th Cir.1968)).

■ Since "[d]istrict courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence," this Court may rule on Defendant's *Daubert* motion on the basis of the parties' papers. *In re Hanford Nuclear Reservation Litigation,* 292 F.3d 1124, 1138 (9th Cir.2002) (citing *United States v. Alatorre,* 222 F.3d 1098, 1100 (9th Cir. 2000)).

**B. Discussion**

Defendants argue that the testimony of Plaintiffs' expert economist, Dr. Owen Phillips, should be excluded on several grounds. In particular, Defendants seek to exclude Dr. Phillips' testimony regarding: (1) the fact and amount of damages; (2) causation of Plaintiffs' injury; (3) the definition of the relevant product market; (4) Defendants' share of the relevant market; and (5) Defendants' alleged anticompetitive conduct. The Court will address each of these issues in turn.

**1. Damages and Causation**

Dr. Phillips performed several statistical analyses in order to estimate the damages suffered by Plaintiffs as a result of Defendants' allegedly anticompetitive conduct. These analyses are of four basic types: (1) the "Yardstick" approach; (2) the "Before-and-After" approach; (3) the "pooled sample" analysis; and (4) damages attributable to ticket surcharges. Defendants do not dispute that Dr. Phillips is qualified as an expert economist, nor do they dispute that statistical analysis may, under appropriate circumstances, properly be admitted into evidence. Instead, Defendants contend that Dr. Phillips failed to "reliably appl[y] the principles and methods [of proper statistical analysis] to the facts of the case" in violation of Rule 702(d).

### a. Legal Requirements For Statistical Analysis

■ As a general matter, flaws in a proffered expert's analysis typically go to the weight, rather than the admissibility, of the expert's testimony. *See, e.g., Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.2002) ("In most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility. Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice.") (internal citation omitted). "In some cases, however, the analysis may be 'so incomplete as to be inadmissable as irrelevant.'" *Id.* (quoting *Bazemore v. Friday*, 478 U.S. 385, 400, n. 10, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)).

A somewhat unique body of law has developed governing whether and under what circumstances statistical analysis proffered by an expert—and, in particular, regression analyses such as those conducted by Dr. Phillips—pass muster under Rule 702. In the seminal case *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the Supreme Court held that the Court of Appeals for the Fourth Circuit erred in ignoring statistical evidence presented by plaintiffs in connection with their employment discrimination claim. *Id.* at 386, 106 S.Ct. 3000. The Court reasoned:

> While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors "must be considered unacceptable as evidence of discrimination." Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

*Id.* at 400, 106 S.Ct. 3000. The Court further reasoned that "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant; but such was clearly not the case here." *Id.* at 400, n. 10, 106 S.Ct. 3000.

"*Bazemore*, however, does not give blanket approval to the introduction of all evidence derived from multiple regression analyses." *Penk v. Or. State Bd. of Higher Educ.*, 816 F.2d 458, 464–65 (9th Cir. 1987). Instead, courts have recognized that by its own terms, the Supreme Court's reasoning in *Bazemore* applies only to a regression analysis "which accounts for the major factors." *See Bazemore*, 478 U.S. at 400, 106 S.Ct. 3000. Thus, in *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir.1999), the Second Circuit concluded that the district court properly gave plaintiff's expert report "no probative value," holding:

> the district court did not reject Gray's regression analysis because it included less than all the relevant variables; rather, it found the evidence not probative because it omitted the major variables. Thus ... Gray's statistical analysis falls within the *Bazemore* exception—that "there may ... be some regressions so incomplete as to be inadmissible as irrelevant."

*Id.* at 449 (quoting *Bazemore*, 478 U.S. at 400 n. 10, 106 S.Ct. 3000) (internal citations omitted).

The importance of accounting for the relevant "major variables" has been recognized as particularly important in the context of antitrust litigation.

> Damage estimates in antitrust cases hinge on careful statistical analysis, reasonable assumptions, reliable data, and the robustness of the results. If any of these areas are circumspect, then the analysis could provide faulty conclusions

as to the existence or the amount of damages.

2A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 399c, p. 447 (3d ed. 2006).

> The correct application of the before-and-after approach [in the context of an alleged conspiracy to monopolize] requires using the prices in the "before" period as an evidentiary foundation for inferring what the prices would have been in the conspiracy period but for the illegal activity. **The determination of the "but for" prices, however, must take into account nonconspiratorial factors that would have caused prices to be different in the conspiracy period even if there had been no conspiracy.**

*Id.* ¶ 399b, at 446 (emphasis added) (discussing potential problems with the application of the "before-and-after" and "yardstick" methodologies in antitrust cases).

> By not including any additional variables in the regression, the possibility of omitted variable bias is high. In other words, there are omitted factors that may influence market share growth. These omitted factors could confound the results of the statistical analysis by biasing the damage estimates. In this way, the regression results do not necessarily identify an effect of USTC's alleged behavior on Conwood's market-share growth by state. Rather, the results only suggest a relationship between initial market share and market-share growth. Because the possibility of omitted variable bias is high, we cannot, therefore, infer anything from these results as to whether there was any illegal behavior and, if so, whether that behavior had any anticompetitive effects.

*Id.* ¶ 399c2, at 455 (discussing flaws in plaintiff's statistical analysis in *Conwood Company, LP v. United States Tobacco Company*, 290 F.3d 768 (6th Cir.2002)).

■ Accordingly, the key question regarding the admissibility of Dr. Phillips' statistical analyses is whether they account for the "major factors." In making this determination, the Court cannot simply assume that variables omitted from the analysis are, in fact, "major factors" which should have been included. There must be some indication that the excluded variables would have impacted the results. *See Sobel v. Yeshiva University*, 839 F.2d 18, 34 (2d Cir.1988) ("We read *Bazemore* to require a defendant challenging the validity of a multiple regression analysis to make a showing that the factors it contends ought to have been included would weaken ... the analysis."). The burden of proof, however, remains on the proponent of the expert testimony. *See Bourjaily*, 483 U.S. at 175–76, 107 S.Ct. 2775.

### b. "Yardstick" Approach

■ Dr. Phillips' "Yardstick" methodology of calculating damages is fairly straightforward. (*See* Dkt. 494, Exh. A, Economic Report of Owen R. Phillips. Ph.D. as it Relates to Denver and Los Angeles Markets ("Phillips Expert Report"), at ¶¶ 264–66). In each geographic market (Denver and Los Angeles), Dr. Phillips calculated the average ticket price for rock concerts promoted by Defendants, and compared this amount to the average ticket price for rock concerts promoted by other promoters (*i.e.*, the "yardstick"). Dr. Phillips found that the average ticket price was higher for rock concerts promoted by Defendants, and concluded that this disparity in price was the result of Defendants' anticompetitive conduct. Dr. Phillips then calculated the difference between these average ticket prices in each market, and multiplied this amount by the total number of tickets sold by Defendants during the relevant time period, resulting in estimated damages of $21,700,599 (Denver market) and $70,596,699 (Los Angeles market). (Dkt. 494, Exh. B, Rebuttal Eco-

nomic Report of Owen R. Phillips. Ph.D. as it Relates to Denver and Los Angeles Markets ("Phillips Rebuttal Report"), at 39 (revised damages calculations)).

Dr. Phillips' "Yardstick" comparison, however, simply assumes—without further examination—that the difference in average ticket prices observed by Dr. Phillips is due entirely to Defendants' allegedly anticompetitive conduct. The analysis does not account for *any* other possible explanation(s) for this disparity. Among other variables, Dr. Phillips' analysis fails to account for differences in artist quality/popularity. Common sense dictates that a more popular music artist typically will command higher ticket prices than a less popular artist. Thus, if Defendants consistently promoted concerts for highly popular acts, one would expect their average ticket prices to be higher than those of rival promoters.

Dr. Phillips himself has acknowledged that artist popularity affects ticket prices and that Defendants promoted many of the most popular artists during the relevant time period. During the June 4, 2007 hearing on class certification, for example, the following exchanges with Dr. Phillips took place:

Q. And you realize that there are factors in addition to considering the competitive price versus the monopoly price that you would have to consider in this analysis, correct?

A. Well, there's going to be complications, because as Clear Channel became larger, they also [began] attracting the very best talent.... But I think there needs to be a check done on the quality of the artists that Clear Channel promotes versus the rest of the market so that damages aren't ... overestimated in effect.

Q. Is there a way, as an economist, that you can do that check for quality in doing a damage analysis here?

A. Yes.

. . . .

THE COURT. It seems to me that if Clear Channel was attracting the best talent, that, as you said, that talent would command a higher ticket price, correct?

WITNESS. Correct.

THE COURT. So the damage analysis would have to include some further analysis to account for that qualitative difference in talent, correct?

WITNESS. Yes, to see if there is a difference.

. . . .

Q. Do you believe that using those average ticket prices will bias damages against Clear Channel?

A. It's possible. And that is why we have to look at differences in qualities of the artists.... [W]e have to make some adjustments for quality in doing the damage analysis.

(Dkt. 405, Exh. 2, at 41:6–51:1; *see also id.* at 43:17–23 (artist popularity can be accounted for by using, *e.g.,* CD sales)).

The only "check" that Dr. Phillips performed to account for artist popularity, however, was to compare Defendants' promoter share (measured in ticket sales) of the "Top 100" rock acts in each geographic market to Defendants' share of the overall market. Dr. Phillips concluded that "Clear Channel's market share for the Top 100 Acts is consistent with its market share in the remainder of the market." (Phillips' Expert Report, at ¶263). The glaring flaw in this purported analysis is that the Top 100 rock acts in each market account for virtually all of the relevant ticket sales.[3] In other words, the Top 100

---

**3.** From 2000 to 2006, the Top 100 artists accounted for 95% of ticket revenue in Los Angeles and 94% of ticket revenue in Denver.

acts in each geographic market effectively comprise the entire market. Thus, Dr. Phillips' "analysis" amounts to nothing more than a simple tautology: Defendants' share of the overall market is consistent with Defendants' share of the overall market. Dr. Phillips conceded as much in his deposition:

Q. So your conclusion is that Clear Channel's share of all concerts is the same as Clear Channel's share of all concerts?

A. In Los Angeles, yeah.

(Dkt. 405-3, Phillips Depo., at 102:11-14).

Q. So the [Top 100] analysis is meaningless? [referring to the Denver market]

A. The money is in the top 100 concerts.

Q. The top 100 analysis is meaningless?

A. Right. Yeah. The top 100—the money is in the top 100 concerts.

(Phillips Depo., at 103:7-11).

In contrast, Defendants have submitted evidence that the artists promoted by Defendants during the relevant time period were, on average, more popular than the artists promoted by rival promoters.[4] This evidence is consistent with Dr. Phillips' observation that Defendants attracted "the very best talent."

Moreover, in order to demonstrate the impact of Dr. Phillips' failure to account for artist popularity, Defendants' expert economist, Dr. Janusz Ordover, conducted a comparison of ticket prices for concerts promoted by Defendants to concerts promoted by other promoters *for the same artists*. Dr. Ordover found that Defendants' ticket prices generally were comparable to, and in several instances lower than, those of competing promoters for concerts by the same artist. (Ordover Expert Report, ¶¶ 170–80).

In his Rebuttal Report, Dr. Phillips contends that Dr. Ordover's analysis fails to account for venue size and, therefore, "is meaningless because the venue size is an important determinant of how prices are set. . . . A popular artist in a small venue will command a higher price than the same performance at a large venue." (Phillips Rebuttal Report, at 34). This assertion by Dr. Phillips, however, simply provides another reason to exclude his "Yardstick" analysis, which similarly fails to account for venue size (or artist popularity, or any variable other than the identity of the concert promoter).

In any event, while Dr. Ordover's analysis may be flawed, artist popularity is undoubtedly a "major factor" in determining ticket prices, which should have been included in Dr. Phillips' "Yardstick" analysis. The failure to do so renders this analysis "so incomplete as to be inadmissible as irrelevant." *See Bazemore*, 478 U.S. at 400, n. 10, 106 S.Ct. 3000.

Plaintiffs have not met their burden of establishing that Dr. Phillips' "Yardstick" damages analysis satisfies the requirements of Rule 702. Accordingly, the Court GRANTS Defendants' Motion to Exclude this testimony.

#### c. "Before–and–After" Approach

■ Dr. Phillips' "Before–and–After" analysis is similarly flawed. In performing this analysis, Dr. Phillips first analyzed average ticket prices (for all live rock mu-

---

(Dkt. 485-2, Expert Report of Janusz A. Ordover, Ph.D. ("Ordover Expert Report"), ¶ 167).

4. From 2001 to 2006, Defendants' share of the top 25 acts in Denver was 63%, compared with a 48% share of the rest of the market; Defendants' share of the top 25 acts in Los Angeles was 71%, compared with a 37% share of the rest of the market. (Ordover Expert Report, ¶ 169).

sic concerts in the Denver and Los Angeles markets) from 1981 through 1998, a period that Dr. Phillips characterizes as "competitive." (*See* Phillips Expert Report, at ¶¶ 267–73). Dr. Phillips then uses this data to "predict" the expected average ticket prices from 2000 through 2006.[5] Next, Dr. Phillips compares these expected average ticket prices to the actual average ticket prices from 2000 to 2006. Because the actual ticket prices are higher than the "expected" values, Dr. Phillips concludes that Defendants' entry into the market in 2000 caused an increase in ticket prices. Based on the difference between the expected ticket prices and the actual prices, Dr. Phillips calculates damages as follows:

**"Before–and–After"**
**Damages Calculations** [6]

| | Convergence Model | Linear Time Trend Model |
| --- | --- | --- |
| Denver | $ 36,005,988 | $21,295,572 |
| Los Angeles | $126,772,722 | $69,725,212 |

With respect to Dr. Phillips' "Before–and–After" analysis, the court's holding in *In re REMEC Inc. Sec. Litig.*, 702 F.Supp.2d 1202 (S.D.Cal.2010) is instructive. There, the plaintiffs' expert performed a multivariate regression analysis (as part of an "event study") to analyze the impact of "corrective disclosures"[7] on the stock price of a public company. *Id.* at 1271–72. The plaintiffs' expert first created a "market index" and an "industry index" (the "independent variables") to account for the market and industry forces that one would expect to impact the company's stock price. *Id.* He then used these independent variables to calculate the daily predicted return on the company's stock

(*i.e.*, the "dependent variable"). *Id.* Finally, the plaintiffs' expert compared this predicted return with the actual return during the relevant time period and found that on the day following a corrective disclosure, the actual stock return "varie[d] markedly from the predicted return." *Id.* Based on his analysis, the plaintiffs' expert concluded that the corrective disclosures had caused these declines in stock price. *Id.*

The court granted defendants' motion to exclude the above-described analysis, holding that it did not meet Rule 702's standards for admissibility as articulated in *Daubert. Id.* at 1273–74. The court reasoned:

Dr. Nye predetermines the results of his analysis. Nye purports to test the hypothesis that REMEC's corrective disclosures exerted a material negative influence on the per-share price of REMEC stock during the class period.... **Nye's model assumes that the difference between actual return and predicted return is necessarily a result of company-specific information.**

**Dr. Nye makes no attempt to account for other possible causes,** *i.e.*, industry-specific news (for example, if an increase in global sales of defense products due to an increase in U.S. presence in Iraq was announced during the class period), market-specific news (for example, if a 5% decline in stock prices occurred across the market due to an announcement of an expected drop in consumer sales in December), or other measurable

---

**5.** Dr. Phillips performed two versions of the "Before–and–After" analysis, one using a "convergence" model to predict future ticket prices, and one using a "linear trend model" to predict future ticket prices. (*See* Phillips Expert Report, at ¶¶ 267–73). Both analyses are flawed for the reasons set forth below.

**6.** *See* Phillips Rebuttal Report, at 39 (revised damages calculations).

**7.** "A 'corrective disclosure' is a disclosure that reveals the fraud [allegedly perpetrated by defendants on a public company], or at least some aspect of the fraud, to the market." *In re REMEC Inc.*, 702 F.Supp.2d at 1266–67.

macroeconomic variables (for example, the inflation rate and GDP).

*Id.* at 1273 (emphasis added).

Accordingly, the court held that Dr. Nye's expert opinion was not relevant and reliable as required under Rule 702. *Id.* at 1275.

> Where a study accounts for the "major factors" but not "all measurable variables," it is admissible. [*Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986).] However, where significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is inadmissible as irrelevant and unreliable. *Bickerstaff,* 196 F.3d at 449. Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that other major factors have been accounted for in a regression analysis. Dr. Nye makes no attempt to do so here, aside from his assertion/assumption that company-specific information is the only major factor.

*Id.* at 1273.

Notably, Dr. Phillips' "Before–and–After" analysis is significantly *less* robust than the analysis rejected by the Court in *In re REMEC Inc. Sec. Litig.* There, the expert's analysis accounted for two independent variables (the "market index" and the "industry index"), in addition to the corrective disclosures that allegedly caused the declines in stock price. Here, Dr. Phillips' "Before–and–After" analysis accounts for no independent variables other than time.[8] Moreover, in *In re REMEC Inc. Sec. Litig.,* the expert observed stock declines after several corrective disclosures by the defendants, arguably supporting his hypothesis that the disclosures

were, in fact, the cause of the declines. Here, only one "event" (*i.e.,* the entry of Defendants into the market in 2000) was considered. Finally, as discussed in more detail below, Dr. Phillips improperly excluded data from the year 1999 from his analysis.

Thus, as in *In re REMEC Inc. Sec. Litig.,* Dr. Phillips impermissibly *assumes* that any observed increase in average ticket prices after 2000 is due entirely to Defendants' anticompetitive conduct, without meaningfully testing this assumption. In particular, Dr. Phillips' analysis impermissibly fails to account for at least two major variables, both of which he has conceded could impact ticket prices: (1) changes in artist quality over the relevant time period; and (2) the emergence of digital downloading of music (using, *e.g.,* Napster or iTunes) and its impact on the price of tickets for live concerts.

With respect to artist quality, Dr. Phillips testified in his deposition that he believes ticket prices have increased due to changes in the "quality" of rock concerts, and that this increase began *prior* to Defendants' entry into the market.

> I let the market self-adjust for quality. So when you look at the market, you can see prices even before the entry of Clear Channel going up. Even without any anticompetitive behavior in the market, I see prices going up, and I presume and I believe that's because of quality changes in rock and roll concerts. So I am saying that the self-adjustment took place in the market.

(Phillips Depo., at 88:11–18). (*See also* Phillips Expert Report, at ¶ 274 (referring to "the emergence of 'superstar' acts in the late 1990s that continued to exist throughout the class period here")).

---

**8.** In his Rebuttal Report, Dr. Phillips incorporates the Consumer Price Index ("CPI") into his analysis. This minor modification does not affect the Court's reasoning.

Nevertheless, Dr. Phillips' "Before–and–After" analyses fail to account for changes in concert quality during the relevant time period. In effect, Dr. Phillips simply assumes—without analysis—that to the extent concert quality changed from 1981 through 1998, concert quality continued to change from 2000 to 2006 at precisely the same rate. This is, of course, not necessarily true. For example, if the Rolling Stones and other highly popular acts began touring more heavily in 2000, one would expect average concert "quality" (and, consequently, average ticket prices) to increase. Moreover, given Dr. Phillips' stated belief that changes in concert quality affect ticket prices, such changes undoubtedly constitute a "major factor," which should have been accounted for under *Bazemore* and its progeny.

With respect to the emergence of digital downloading, at least one industry observer has concluded that the increasing availability of music on the Internet is the "main reason" for the recent increase in concert ticket prices.

I suspect the main reason [for rising ticket prices] is that the growing ability of fans to download music free from the Web—legally or illegally—has cut into artists' revenues. Millions of people have downloaded music from Napster, Morpheus and KaZaA—and bought fewer records as a result. Music sales are plummeting, putting downward pressure on artists' royalties.

In this environment, concerts take on a different meaning for artists and their managers. In pre-Napster days, concert prices were kept below their market rate to help sell albums, a complementary good. Now concert prices are set with an eye toward maximizing concert revenue.

Bands have always had cadres of fans, whose loyalty conferred monopoly power. Yet they were reluctant to exploit this power by charging higher prices because they wanted to sell more albums. When revenue from albums began to dry up, it was natural for bands to raise concert prices.

. . . .

It is not that bands have become greedier; it is that the technology changed to make it less profitable to charge below-market prices for concerts.

(Dkt. 405–12, Alan B. Krueger, Economic Scene; Music sales slump, concert ticket costs jump and rock fans pay the price, New York Times (October 17, 2002)).

In his deposition, Dr. Phillips conceded that digital downloading of music has, in fact, affected artists' approach to concert profitability.

Q. What is Napster?

A. Napster is a digital download music site back in the late '90s.

Q. 1998, 1999, right?

A. Yes.

Q. Didn't that fundamentally change the pricing of concert tickets?

MS. CONNOLLY: Objection to form.

A. Possibly. You know, it's interesting. I don't—it's hard to sort out the impact of Napstar (sic) from iTunes, and in my mind, Napster really started the digital download movement, but I think iTunes really had more of an impact.

Q. (BY MR. JACOBSON) So isn't it true before Napster and iTunes that artists performed in concerts to promote record sales, while after Napster and during iTunes, artists now release records to promote concert revenue?

MS. CONNOLLY: Objection to form.

Q. (BY MR. JACOBSON) Isn't that undeniably true?

MS. CONNOLLY: Same objection.

A. I don't know if it's true because here's what I think. I think that all along there's a relationship there where an artist will do a concert to promote their recordings and they will do recordings to promote their concerts. It's a complementary relationship, but I think, you know, over time, given the popularity of digital downloads that the complementary relationship has changed. I'm not quite sure how it has changed, but it has changed, and artists are doing more concerts now because they have the opportunity to make more profit from the concert, more revenue from the concert relative to their recordings than I think before.

Q. All right. So how does your Before–and–After analysis capture that impact?

A. It captures the trend. I mean the trend begins, and it just maps it out.

(Phillips Depo., at 211:24–213:10).

Notably, the emergence of digitally-available music on the Internet (in approximately 1998/1999 according to Dr. Phillips) occurred immediately prior to 2000, the year in which Dr. Phillips concluded Defendants' entry into the market caused ticket prices to increase. This fundamental change in marketplace dynamics clearly qualifies as a "major factor," which should have been accounted for—in some fashion—in Dr. Phillips' analysis.

Finally, and perhaps most troubling to the Court, Dr. Phillips' "Before–and–After" analyses completely ignore the dramatic increase in ticket prices that occurred in 1999, the year *before* Clear Channel entered the rock concert promotion market. To the Court's chagrin, Dr. Phillips simply excluded 1999 from his data set, and performed the "Before–and–

After" analyses as though 1999 had never occurred.

Dr. Phillips explains that he excluded data from 1999 because "during this year SFX [whom Clear Channel ultimately acquired] was actively acquiring and consolidating concert promoters. In my opinion there was anticompetitive conduct taking place, and there were Department of Justice investigations in the company's conduct. Including 1999 would be using an anticompetitive year in the markets to predict future competitive prices beginning in 2001." (Phillips Rebuttal Report, at 36 (citing a September 3, 1998 Los Angeles Times article)).

This purported explanation for the exclusion of 1999 fails for several reasons. First, according to Dr. Phillips' own data, Defendants' market share in 1999 was 2.34% in the Denver market and 0.0% in the Los Angeles market. (*See* Phillips Rebuttal Report, Revised Exhs. 1, 2).[9] These *de minimis* market shares are insufficient as a matter of law to support monopolistic conduct. *See* 2 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* § 25.03[3][a], at 25–37 (Matthew Bender 2d ed.) (hereinafter "*Antitrust Laws and Trade*") ("[C]ourts have held that a low market share (generally below 40 percent) either precludes a finding of monopoly power or requires a finding of no monopoly power.").

Second, this explanation is directly contrary to Dr. Phillips' previous representations to this Court, based upon which the Court granted Plaintiffs' Motion for Class Certification. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. at 136 & n. 32 ("At the hearing, Phillips testified that he could determine whether Clear Channel imposed a monopoly overcharge through a variety of methods. First, Phillips testified that he could use the relevant market

9. Presumably, this data includes SFX, whom Defendants acquired in 2000.

in 1999 as a benchmark because Clear Channel possessed a small market presence in 1999 and its ticket prices were comparable with competitors' ticket prices in 1999. This approach is commonly referred to as the 'before-and-after' approach.") (citing Hearing Tr. at 39:25–40:19).

Finally, even if anticompetitive conduct was, in fact, occurring in 1999, this conduct would not justify the wholesale exclusion of 1999 from Dr. Phillips' analysis. The law is clear that Dr. Phillips must *account for* major factors (such as allegedly anticompetitive conduct in 1999); he cannot simply *ignore* them and perform the analysis as if they did not exist.

The exclusion of 1999 undoubtedly had a significant impact on the results of Dr. Phillips' analysis. (*See generally* Ordover Expert Report, ¶ 192). As demonstrated in the chart below, the average ticket prices (for all concerts) in both Denver and Los Angeles increased dramatically in 1999. In Los Angeles, the change in average ticket price from 1998 to 1999 represented the largest one-year increase (30.11%) in the twenty-five years studied by Dr. Phillips. In fact, average ticket prices in Los Angeles actually *decreased* in 2000, the year that Dr. Phillips concludes Defendants' entry into the market caused ticket prices to rise to supracompetitive levels. Moreover, by excluding the significant price increase that occurred in 1999 from the "before" period, Dr. Phillips' model effectively builds the full amount of this increase into his estimated damages—notwithstanding the fact that this increase occurred *before* Defendants' entry into the market. As such, the analysis is hopelessly flawed.

*Average Ticket Prices (all concerts)*[10]

**10.** Source: Phillips Rebuttal Report, Appendix 1: Revised Exhibit 5 (Denver Market), Revised Exhibit 7 (Los Angeles Market).

Average Ticket Price (Denver) ◆ Average Ticket Price (LA) ■

Plaintiffs have not met their burden of establishing that Dr. Phillips' "Before–and–After" approach to calculating damages satisfies the requirements of Rule 702. Accordingly, the Court GRANTS Defendants' Motion to Exclude this testimony.

#### d. "Pooled Sample" Analysis

■ In his Rebuttal Report, Dr. Phillips performed an additional "pooled sample" analysis. For purposes of this analysis, Dr. Phillips combined all concerts from 1981–2006 (including concerts in both Los Angeles and Denver). (*See* Phillips Rebuttal Report, at 39, 64–67). He then ana-lyzed this data in order to test his hypothesis that a "structural break" occurred in 2000. According to Dr. Phillips, this analysis "allows for a structural break in the market starting in 2000." (*Id.* at 64).

This "pooled sample" analysis is fatally flawed for the same basic reason discussed above; namely, it fails to account for any "major factors" (other than Defendants' entry into the market in 2000) that could have caused and/or contributed to an increase in ticket prices. Moreover, the "pooled sample" analysis fails even to consider whether a so-called "structural break" occurred in any year other than

2000. To the contrary, Dr. Phillips concedes that there may be "structural breaks" in other years; he simply did not test for them. (*See* Dkt. 405-4, Phillips Depo., at 450:8–452:8). Finally, the "pooled sample" analysis impermissibly combines two geographic markets (Denver and Los Angeles) in order to reach the desired result. While these MDL actions have been consolidated for the sake of judicial efficiency, this Court consistently has recognized that the antitrust analysis in each case must be done on a market-specific basis.

Plaintiffs have not met their burden of establishing that Dr. Phillips' "pooled sample" analysis satisfies the requirements of Rule 702. Accordingly, the Court GRANTS Defendants' Motion to Exclude this testimony.

### e. Ticket Surcharges

In his Expert Report, Dr. Phillips opines that Defendants' monopoly power allowed them to add a variety of surcharges to the base price of tickets for the concerts they promoted. (*See* Phillips Expert Report, ¶¶ 276–82). "[W]hile Clear Channel assesses these charges, for the most part its competitors do not." (*Id.* at ¶ 279). In particular, Dr. Phillips contends that Defendants charged "monopoly rent" in the form of: (1) facility maintenance fees ("FMF"); and (2) parking fees in certain Los Angeles venues, which were charged regardless of whether the purchaser actually parked at the venue in question. According to Dr. Phillips, the total damages attributable to these surcharges is $2,753,709.12 (Denver) and $12,043,947.41 (Los Angeles). (Phillips Expert Report, at ¶ 282).

■ Defendants do not argue in their *Daubert* Motion that Dr. Phillips' testimony regarding these surcharges should be excluded; Defendants address these surcharges only in their Motions for Summary Judgment. Nor can the Court

discern any obvious reason why this testimony should be excluded under Rule 702. The damage calculations appear to be straightforward, with no apparent methodological flaws that would render them unreliable. With respect to causation, Dr. Phillips' opinion that Defendants' monopoly power allowed them to assess the above-described surcharges generally appears to be within his area of expertise as an economist.

Accordingly, the Court will not exclude Dr. Phillips' damages calculations based on the ticket surcharges assessed by Defendants under Rule 702.

### 2. Definition of the Relevant Market

Dr. Phillips opines that for purposes of Plaintiffs' antitrust claims, the relevant product market is comprised of "live rock music concerts." (*See* Phillips Expert Report, ¶¶ 40–64). Defendants contend that this opinion should be excluded under Rule 702, because Dr. Phillips failed to utilize a reliable methodology in defining this purported market. As a result, Defendants contend that Dr. Phillips' proposed market definition is both under-inclusive and over-inclusive; under-inclusive in that it improperly excludes concerts that are reasonable substitutes for concerts included in Dr. Phillips' definition (*e.g.*, concerts by certain "pop" artists); over-inclusive in that it improperly includes concerts that are not reasonable substitutes for one another (*e.g.*, "classic rock" concerts, which are not reasonable substitutes for "heavy metal" concerts). (*See* Motion, at 16).

For the reasons set forth below, the Court agrees that Plaintiffs have failed to meet their burden of establishing that Dr. Phillips' proposed definition of the relevant product market is sufficiently reliable and helpful to the trier of fact to warrant inclusion under Rule 702 and *Daubert*.

### a. Applicable Substantive Law

■ "For antitrust purposes, a 'market is composed of products that have reason-

able interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir.2003) (quoting *Int'l Boxing Club, Inc. v. United States*, 358 U.S. 242, 250, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959)). "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir.1988).

> In standard antitrust analysis, the court considers both "demand elasticity" and "supply elasticity" in determining whether anticompetitive effects are likely. *Rebel Oil*, 51 F.3d at 1436. In other words, courts determine the degree to which price increases will cause marginal buyers to turn to other products or marginal suppliers to increase output of the product.

*United States v. Oracle Corp.*, 331 F.Supp.2d 1098, 1118 (N.D.Cal.2004).

As this Court observed in its previous Order Granting Class Certification, calculating the cross-elasticity of demand is often an economist's first step in defining the relevant product market. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. at 123. Nevertheless, while calculating the cross-elasticity of demand (and supply) is the preferred methodology, it is not an absolute requirement. In *Independent Ink, Inc. v. Trident, Inc.*, 210 F.Supp.2d 1155 (C.D.Cal.2002), for example, the court observed that in order to define the relevant product market:

> Plaintiff must proffer "market data, figures or other relevant material adequately describing the nature, cost, usage, or other features of competing products" to determine the bounds of the relevant market.

*Id.* at 1170–71 (quoting *Bhan v. NME Hosps., Inc.*, 669 F.Supp. 998, 1018 (E.D.Cal.1987), *aff'd*, 929 F.2d 1404 (9th Cir.1991)).

> Reliable measures of supply and demand elasticities provide the most accurate estimates of relevant markets. However, it is ordinarily quite difficult to measure cross-elasticities of supply and demand accurately. Therefore, it is usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity data.

*U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 995 (11th Cir.1993) (quoting *International Tel. & Tel. Corp.*, 104 F.T.C. 208, 409 (1984)).

In the seminal *Brown Shoe* decision, the Supreme Court identified several "practical indicia," which it concluded could be relied upon to determine the boundaries of a product submarket for purposes of antitrust analysis.

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

Although *Brown Shoe* involved the challenge of a merger under Section 7 of the

Clayton Act, courts have recognized that its submarket analysis is equally applicable to claims brought under the Sherman Act.

> Although *Brown Shoe* involved a claim under Clayton Act § 7, its submarket analysis is applicable in Sherman Act cases. *See Greyhound [Computer Corp., Inc. v. International Business Machines Corp.]*, 559 F.2d [488], at 494 n. 7 [ (9th Cir.1977) ]. Such applicability follows because the same considerations essential to line of commerce analysis under the Clayton Act are essential to market analysis under the Sherman Act. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1270–71 (9th Cir.1975).

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1375 n. 1 (9th Cir.1989).

Moreover, while the Court in *Brown Shoe* was evaluating the definition of a product "submarket" (where the relevant product "market" already had been defined), the Ninth Circuit has observed: "Because every market that encompasses less than all products is, in a sense, a submarket, these [*Brown Shoe* ] factors are relevant even in determining the primary market to be analyzed for antitrust purposes." *Olin Corp. v. FTC*, 986 F.2d 1295, 1299 (9th Cir.1993) (citing *United States v. Continental Can Co.*, 378 U.S. 441, 449–55, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964)).

> "[S]ubmarket indicia" are best viewed as "proxies for cross-elasticities [of supply and demand], and thus the identification of a submarket is in principle no different than the identification of a relevant market." This is to say that nothing would be lost by deleting the word "submarket" from the antitrust lexicon.

2A Areeda & Hovenkamp, *Antitrust Law,* ¶ 533, at 257 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n. 4 (D.C.Cir.1986)).

While the Ninth Circuit has acknowledged that the practical indicia identified in *Brown Shoe* are "relevant" to the definition of the primary product market, *see Olin*, 986 F.2d at 1299, it has never expressly held that a plaintiff (and, more specifically, a plaintiff's expert economist) can define the relevant product market *exclusively* by reference to these "practical indicia." This case provides an additional wrinkle, in that Dr. Phillips effectively bases his proposed product market definition entirely upon his *qualitative* assessment of the market, without any supporting *quantitative* economic analysis.[11] Even where

---

**11.** Dr. Phillips has, of course, performed a number of quantitative analyses, several of which are discussed earlier in this Order. Notably, however, none of these analyses address the fundamental question of what products should be included in the relevant market. Instead, they primarily relate to the calculation of Defendants' market share (presuming the product market is defined as Dr. Phillips proposes) and damages. (*See generally* Phillips Expert Report, Exhs. 1–10; *cf. id.* at ¶¶ 50–62 (defining the relevant product market without reference to quantitative economic analysis)).

During his deposition, Dr. Phillips conceded, "I didn't look at any particular cross-price elasticity analyses. I looked at the qualitative evidence in defining the market," but went on to state "I did look at the prices of Clear Channel and their sales and tracked their prices and sales as part of my definition of the market." (Phillips Depo., at 373:8–13). In support, Dr. Phillips cited Exhibits 1 and 2 of his Expert Report. (*Id.* at 376:14–15). These Exhibits are not, however, analyses of what products should be included in the relevant product market. Instead, they appear to be precisely what they are entitled, namely, analyses of "[Denver/Los Angeles] Rock Concert Ticket Prices and Sales, Clear Channel Market Shares and Damage Calculations." When analyzing and defining the relevant product market in his Expert and Rebuttal Reports, Dr. Phillips does not rely on either of these Exhibits. (*See* Expert Report, at ¶¶ 50–62; Rebuttal Report, at 1–3; 7–9). As one would expect, Dr. Phillips instead relies on

an economist is unable to calculate the cross-elasticity of demand (and/or supply), at least two of the practical indicia identified in *Brown Shoe*—"distinct prices" and "sensitivity to price changes"—would appear to lend themselves well to a quantitative approach.

The Court has had some difficulty in locating cases addressing the unique circumstances presented in this case. Nevertheless, for purposes of the instant motion, the Court assumes that an expert economist may, under appropriate circumstances, define the relevant product market through an entirely qualitative assessment of the "practical indicia" identified in *Brown Shoe*. *See generally Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F.Supp.2d 1048, 1082 (D.Colo.2004) (collecting cases in which courts held that a plaintiff may define the relevant product market without calculating the cross-elasticity of demand, so long as sufficient evidence of other indicia of reasonable interchangeability is introduced).

Under these circumstances, however, the Court will closely scrutinize Dr. Phillips' proposed product market definition in order to ensure that his analysis is sufficiently robust to warrant admission under Rule 702 and *Daubert*. *See generally Grason Elec. Co. v. Sacramento Mun. Utility Dist.*, 571 F.Supp. 1504, 1521 (E.D.Cal. 1983) ("As the defendant fairly observes, such a determination [of the relevant product market] generally requires a *detailed examination* of 'market data, figures or other relevant material adequately describing the nature, cost, usage or other

features of competing products.'") (quoting *Morton Buildings, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 919 (8th Cir.1976)) (emphasis added).

### b. Dr. Phillips' Definition of the Relevant Product Market

Here, the Court finds that Dr. Phillips' proffered definition of the relevant product market is inadmissible for two independent, albeit related, reasons. First, Dr. Phillips failed to satisfy Rule 702's requirements in formulating his definition of the relevant product market; *i.e.*, in determining that the relevant product market is comprised of "live rock music concerts." Second, Dr. Phillips failed to utilize a reliable methodology to populate this market as defined; *i.e.*, in determining which performers qualify as "rock" artists, and thus which concerts qualify as "rock" concerts, under his proposed definition.

### (1) Definition of the Relevant Market

■ In formulating his proposed definition of the relevant product market ("live rock music concerts"), Dr. Phillips: (1) failed reliably to apply his chosen methodology to the facts of this case; (2) failed adequately to consider the "practical indicia" identified in *Brown Shoe*; and (3) failed to consider the cross-elasticity of supply. The Court will address each of these deficiencies in Dr. Phillips' analysis in turn.

#### (a) The SSNIP Test

In his Expert Report, Dr. Phillips states that in defining the relevant product market, he utilized the methodology set forth

these Exhibits to support his opinions regarding Defendants' market share, monopoly power, and damages calculations.

Accordingly, Dr. Phillips' unsupported statements at his deposition, indicating that Exhibits 1 and 2 support his proposed product market definition, do not transform his admittedly qualitative evaluation of the rele-

vant product market into a quantitative analysis. *See Kumho*, 526 U.S. at 157, 119 S.Ct. 1167 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.").

in the U.S. Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines, issued August 19, 2010 (the "Horizontal Merger Guidelines"). The Court will refer to this methodology as the "SSNIP" methodology.[12] As described by Dr. Phillips in his Expert Report, the SSNIP methodology requires an iterative approach. "In order to define a relevant market, economists begin with the *narrowest* definition of a product (or product group) and expand that definition until all reasonable substitutes are included." (Phillips Expert Report, at ¶ 41 (emphasis in original)); *see also* 2 Kalinowski, *Antitrust Laws and Trade*, § 24.04[2], at 24–69, 24–70 (describing methodology set forth in the 1992 Guidelines).

As a general matter, the Court assumes that the SSNIP methodology may, under appropriate circumstances, provide an acceptable framework with which to define a relevant product market for purposes of antitrust analysis under Section 2 of the Sherman Act. *See generally* 2 Kalinowski, *Antitrust Laws and Trade*, § 24.02, at 24–34 ("The Department of Justice and Federal Trade Commission have issued a set of guidelines describing how those agencies will review transactions generally and define markets specifically when considering a proposed combination. The guidelines do not deviate from judicial precedent but attempt to provide a simplified approach. These guidelines are not binding on the courts."); *see also Thurman Industries*, 875 F.2d at 1375 n. 1 (noting *Brown Shoe*'s analysis of the relevant market under Section 7 of the Clayton Act (*i.e.*, in a merger case) is applicable in Sherman Act cases).

After careful review of Dr. Phillips' Expert Report, however, it is apparent to the Court that Dr. Phillips did not reliably apply the SSNIP methodology to the facts of this case. Accordingly, Dr. Phillips' market definition must be excluded. *See* Rule 702(d) (expert testimony is admissible only where "the expert has reliably applied the principles and methods to the facts of the case.").

Here, Dr. Phillips did not employ the iterative approach called for under the SSNIP methodology. Instead, his market analysis both started and ended with the purported market for live "rock" music concerts. Dr. Phillips never meaningfully considered any *narrower* definition of the market, nor did he ever "expand that definition until all reasonable substitutes [were] included" as required under his own formulation of the SSNIP methodology. *See id.* In his deposition, for example, Dr. Phillips conceded that he never specifically evaluated any potential product markets *narrower* than his proposed market of live rock music concerts.

Q. What did you do to apply the smallest market principle in this case?

A. ... **[M]y smallest market principle stopped at the music genre rock.**

Q. You would agree, wouldn't you, that there are subgenres of rock?

A. There are.

. . . .

Q. What did you do to test whether applying the smallest market principle one could determine a market under your own methodology that is

---

12. *See* Horizontal Merger Guidelines, at 9 ("Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypo- thetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms.").

smaller than rock, such as a subgenre?

[Objection to form]

A. It's subjective in the sense that rock concerts generally substitute for one another....

(Phillips Depo., at 123:17–124:17 (emphasis added)).

Thus, instead of starting with the *"narrowest* definition of a product (or product group)"—*e.g.,* an identifiable "subgenre" of rock—and expanding that definition until he was satisfied that all reasonable substitutes were included, Dr. Phillips simply started his analysis with the assumption that "rock" concerts constituted the relevant market, and looked for corroborating evidence without meaningfully testing this assumption. *See Claar v. Burlington N. R.R.,* 29 F.3d 499, 502–03 (9th Cir.1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the proper application of the scientific method under *Daubert* ].").

As a result, instead of answering the critical question: "What products comprise the relevant market?" Dr. Phillips' analysis devolved into a determination of: "Which performers qualify as 'rock' musicians?"

Q. To populate your relevant market and to exclude those outside of it, it was purely and simply a determination of, quote, whether an artist was, quote, rock or not, correct?

[Objection]

A. That was the main determinant, rock—

Q. What else was there?

A. —did they do rock music.

Q. What else was there?

A. That was the determination. It was rock, yeah.

Q. Okay.

A. Were they rock or not. If they were rock, they were in the market. If not, they were out of the market.

(Phillips Depo., at 116:24–117:14).

This approach impermissibly predetermined the results of Dr. Phillips' analysis; i.e., that the relevant product market is comprised of live music concerts by "rock" artists. *See generally In re REMEC Inc. Sec. Litig.,* 702 F.Supp.2d at 1273 (expert analysis inadmissible where expert's methodology "predetermines the results of his analysis.").

Dr. Phillips' failure even to consider the possibility of a narrower product market is also contrary to the approach outlined in the Horizontal Merger Guidelines, upon which Dr. Phillips purported to rely, which stresses the importance of defining the relevant market as narrowly as possible.

Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers.

(Horizontal Merger Guidelines, at 8).

In evaluating Dr. Phillips' market analysis, the Court's focus is exclusively on Dr. Phillips' methodology, not his results. *See GE v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[T]he 'focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.... [But a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") (citations omitted). Here, the Court finds that Dr. Phillips' failure to analyze, in a meaningful way, the possibility of a narrower or broader product market renders his purported applica-

tion of the SSNIP methodology unreliable under Rule 702(d).

### (b) *Brown Shoe* Analysis

In addition to the methodological deficiencies discussed above, the Court also finds that Dr. Phillips' analysis of the relevant product market does not adequately consider the "practical indicia" identified in *Brown Shoe*, and fails to satisfy Rule 702's requirements on this basis as well.

As noted above, Dr. Phillips' failure to calculate the cross-elasticity of demand (or supply) is not necessarily fatal to his proposed market definition. Further, the Court has assumed that (under appropriate circumstances) an expert economist may define the relevant product market based entirely on a qualitative assessment of the "practical indicia" identified in *Brown Shoe, i.e.*: (1) industry or public recognition of the market as a separate economic entity; (2) the product's peculiar characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; and (7) specialized vendors. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502.

The existence of three or four of these indicia has been held "sufficient to delin-

eate a submarket[.]" 2 Kalinowski, *Antitrust Laws and Trade*, § 24.02[2][a], at 24–86.

### (i) Analysis Based on a Single Factor

Here, Dr. Phillips' analysis of the relevant market rests, for all intents and purposes, on a single *Brown Shoe* practical indicium: "industry or public recognition of the submarket as a separate economic entity." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502. As described by Dr. Phillips in his Expert Report:

> [T]he collective perceptions of buyers and sellers and other persons close to the industry must be relied upon to make a determination of the relevant market. Specifically, if participants in and agents close to the industry perceive goods to be close substitutes in the sense defined by the Merger Guidelines, economists are inclined to place the goods in the same market.

(Phillips Expert Report, ¶ 43 (emphasis in original omitted)).

Even assuming that this statement is correct (and the "collective perceptions of buyers and sellers and other persons close to the industry" support Dr. Phillips' proposed definition of the relevant product market),[13] the fundamental flaw in Dr.

---

**13.** For purposes of this analysis, the Court accepts Dr. Phillips' conclusion that there is industry/public recognition of the purported market for "live rock music concerts" (*i.e.*, the first *Brown Shoe* practical indicium is satisfied). Nevertheless, the Court notes that the industry materials upon which Dr. Phillips purports to rely in reaching this conclusion are far from consistent.

For example, the website www.allmusic.com, upon which Dr. Phillips relied in order to classify various artists by music genre, (*see* Phillips Depo., at 140–41), does not identify "rock" as a standalone music category, but instead lists an umbrella category for "pop" and "rock" combined (i.e., "pop/rock"). The website further identifies a number of different sub-genres of "pop/rock" music. (*See* http://www.allmusic.com/explore/genre/pop-rock-d20).

Similarly, Dr. Phillips cites a June 8, 2009 USA Music Preferences report for the proposition that "there is a well-defined market for the promotion of rock concerts" and "rock music appeals to very different audiences than [do other types of music.]"). (*See* Phillips Rebuttal Report, at 7 & n. 17 (citing David McLaughlin, USA Music Preferences, Appendix 1: Music Preferences in the U.S. 1982–2002 (June 8, 2009), available at http://www.scribd.com/doc/l6203729/Usa-Music-Preferences)). This Report, however, does not analyze "rock" as a stand-alone category. Instead, it divides "rock" into two categories—"Classic Rock/Oldies" and "Rock/Heavy Metal"—each of which the Report analyzes independently.

To reiterate, the Court does not cite these inconsistent industry definitions of various music genres in an attempt to refute Dr. Phil-

Phillips' analysis is that he goes no further. In focusing on industry/public recognition of the purported market for live rock music concerts, Dr. Phillips either ignores, or addresses in cursory fashion, the remaining six *Brown Shoe* practical indicia.

The Court briefly addresses each of these additional *Brown Shoe* practical indicia below.

### (a) Peculiar Characteristics and Uses

The closest that Dr. Phillips' Report comes to identifying a peculiar characteristic or use of "live rock music concerts" is quoting, without further discussion, the dictionary definition of "rock music." (*See* Phillips Expert Report, at ¶ 50 ("Webster's Ninth New Collegiate Dictionary (p. 1020) defines rock music as 'popular music played on electronically amplified instruments and characterized by a persistent heavily accented beat, [with] much repetition of simple phrases....")). The mere quotation of a dictionary definition—absent more—simply does not constitute meaningful expert *economic* analysis of this factor. Moreover, Dr. Phillips' Expert Report fails to consider whether the above-quoted definition applies exclusively to "rock" music, or whether it accurately characterizes a broader category of music (*e.g.,* "rock/pop") or whether it would, in contrast, better characterize one or more sub-genres of "rock" (*e.g.,* "classic rock" or "heavy metal").

Dr. Phillips' failure adequately to consider this factor is noteworthy in that " 'peculiar characteristics and uses,' although not necessary to the finding of a submarket, is the factor most often cited by courts in cases where product submarkets are demonstrated." 2 Kalinowski, *Antitrust Laws and Trade,* § 24.02[2][c], at 24–71.

### (b) Unique Production Facilities

In the section of Dr. Phillips' Expert Report entitled "The Relevant Market," Dr. Phillips does not discuss the presence (or absence) of any purportedly "unique production facilities" for live rock music concerts. (*see* Phillips Expert Report, at ¶¶ 40–64). In the preceding section, entitled "Production Inputs for Live Concerts," Dr. Phillips opines that there are three "production inputs" for live music concerts in general: (1) music talent (*i.e.,* the music artist(s) performing at the concert); (2) radio promotion (*i.e.,* advertising and promotion for the concert on one or more radio stations); and (3) venue (i.e., the physical location at which the concert is held). (*Id.* at ¶¶ 28–39). Dr. Phillips, however, describes these production inputs as necessary components for the promotion of *all* live music concerts. (*See id.*). He does not argue that these production inputs are unique to the purported market for live *rock* music concerts, such that they support his proposed definition of the relevant product market under *Brown Shoe.* (*See generally* Phillips Expert Report, at ¶¶ 28–39 (discussing "production inputs"); ¶¶ 50–62 (discussing product market); ¶¶ 239–47 (discussing barriers to entry)).

The Court further addresses the three "production inputs" identified by Dr. Phillips below.

lips' conclusion that there is industry/public recognition of the purported market for "live rock music concerts." Instead, the Court notes these inconsistencies because they underscore the importance of performing a *thorough* analysis of the practical indicia identified in *Brown Shoe,* which (as discussed below) Dr. Phillips failed to do. *See generally Grason,* 571 F.Supp. at 1521 (determination of the relevant product market requires a "detailed examination" of the relevant materials). In other words, the Court could envision a scenario in which the evidence supporting a single *Brown Shoe* indicium was so overwhelming that it (at least arguably) would obviate the need for meaningful analysis of the remaining indicia. This is not such a case.

### (i) Venue

With respect to venue, Dr. Phillips expressly conceded in his deposition that this "production input" is not unique to live rock music concerts.

Q. Isn't it true that all promoters use the same facilities to promote rock concerts as they do country and jazz concerts?

A. I would say so. There's music venues, and it doesn't really depend on the music.

(Phillips Depo., at 151:20–24).

### (ii) Radio Promotion

With respect to the radio "production input," Dr. Phillips notes in his Expert Report that radio stations often play a "mix" of different types of music, (*see, e.g.,* Phillips Expert Report, at ¶ 53 ("there are formats like contemporary Hit Radio (CHR) which play a mix of rock and popular music")),[14] and that there is "cross-promotion" among radio stations, meaning that "rock" concerts may be promoted on radio stations that play non-"rock" music. (*See* Phillips Expert Report, at ¶ 81 ("A fifth Clear Channel station, KFMD (KHIH) is a top 40, contemporary hits station, and cross-promotes with rock music concerts, and could be added to the above list [of radio stations relevant to the purported 'rock' market]")).

While Dr. Phillips expressly excludes "pop" music concerts from his definition of the relevant product market, (*See* Dkt. 405, Yen Decl., Exh. 17 (defining concerts as either "rock", "pop", or "other")), Dr. Phillips expressly includes "pop" radio stations (*i.e.,* "contemporary hits" stations) in his analysis of the "radio" production input. (*See, e.g.,* Phillips Expert Report at ¶ 88 ("This list [of "rock" radio stations]

specifically includes CHR formats."); *id.* at ¶¶ 81, 89–90).

### (iii) Music Talent

Similarly, when evaluating Clear Channel's allegedly anticompetitive conduct in his Expert Report, Dr. Phillips treats "rock" and "pop" artists as functionally interchangeable. When discussing Clear Channel's alleged control of the relevant "production inputs", for example, Dr. Phillips states:

> When promoting concerts, [Clear Channel] owns or controls radio inputs, venues, and much of its music talent through long-term exclusive contracts with artists such as the Rolling Stones, Madonna, U2, Jay–Z, Shakira, Nickelback and the Jonas Brothers.

(*Id.* at ¶ 27). While Dr. Phillips categorizes The Rolling Stones, Madonna, U2 and Nickelback as "rock" artists, he classifies both Shakira and the Jonas Brothers as "pop" artists, and Jay–Z as "other". (*See* Dkt. 405, Yen Decl., Exh. 17). Nevertheless, Dr. Phillips refers to these non-"rock" artists as "production inputs" in precisely the same manner as he refers to "rock" artists. (*See also, e.g.,* Phillips Expert Report, at f 126 (discussing allegedly anticompetitive behavior in connection with "Wango Tango[,] an annual day-long concert festival promoted by Clear Channel's KIIS FM radio. The festival invites a collection of pop and rock artists to perform free of charge at large venues in Southern California")).

\* \* \*

Dr. Phillips does not base his definition of the relevant product market on any purported uniqueness of production facilities. (*See* Phillips Expert Report, at ¶¶ 40–62). Moreover, to the extent that

---

**14.** *See also* Phillips Expert Report, at ¶ 76 (discussing various radio stations "that often play high percentages of rock music").

Dr. Phillips' Expert Report can be said to address this issue, it does so in a manner contrary to his ultimate conclusion that the relevant market is comprised only of live *rock* music concerts. *Cf.* 2 Kalinowski, *Antitrust Laws and Trade*, § 24.02[2][f], at 24–76, 24–77 ("Evidence that a product ... requires facilities or technology *markedly different* from that used to produce its alleged substitutes supports the existence of a submarket.") (emphasis added).

### (c) Distinct Prices and Specialized Vendors

With respect to "distinct prices" and "specialized vendors," Dr. Phillips does not address these indicia as they relate to his proposed product market definition of live *rock* music concerts. He addresses them only as to live music concerts generally.

It is also my opinion live music concerts are separate products from other live events or other types of entertainment. They have several features distinct from performances that are filmed or purely audio.... [C]oncerts are distinct from movies, videos, and audio recordings.... In addition, there are distinct prices for concert tickets.... And there are specialized vendors. The major promoters—Clear Channel and Anschutz Entertainment Group (AEG)—do not sell or rent video or audio recordings except as an adjunct to specific concerts.

(Phillips Expert Report, at ¶¶ 60–61).

### (d) Sensitivity to price changes

Dr. Phillips does not address this factor.

### (e) Distinct Customers

The only portion of Dr. Phillips' market analysis that arguably addresses the issue of distinct customers for "live rock music concerts" states: "[According to a survey by the U.S. Census Bureau,] '[s]even in ten young adults (age 18 to 24) say they like rock, compared with only 7 percent of adults aged 75 and older.'" (Phillips Expert Report, at ¶ 52).[15]

The mere observation that younger people are more likely to listen to rock music, however, is insufficient—on its own—to constitute meaningful expert analysis of this factor. As a preliminary matter, the cited survey appears to address general music listening patterns (e.g., when listening to music on the radio); it says nothing about *live concert* attendance, which is the relevant issue in this case. Moreover, as with all *Brown Shoe* indicia, the purpose of the "distinct customers" inquiry is to *distinguish* the products in the proposed market (or submarket) from potential substitutes. Here, however, Dr. Phillips does not purport to identify any "distinct" customer base for live rock music concerts, nor does he make any attempt to differentiate any such customer base from that of potentially larger markets (e.g., the market for live "rock/pop" music concerts), or smaller markets (e.g., the market for live "classic rock" or "heavy metal" concerts).[16]

### (f) *Brown Shoe* Practical Indicia: Conclusion

The Court has found minimal case law addressing the application of Rule 702's

---

**15.** The Report similarly states: "A survey conducted for the National Endowment for the Arts by the U.S. Census Bureau found that, for example, 'Country audiences have a distinct demographic profile, and they tend not to cross over into other types of music.'" (*Id.; see also* Phillips Rebuttal Report, at 7 & n. 17).

**16.** In his Rebuttal Report, Dr. Phillips purports to bolster his analysis based on discus-

sions with his students regarding their music listening patterns. (*See* Phillips Rebuttal Report, at 8). The definition of the relevant product market cannot, however, properly be based on such "limited anecdotal evidence." *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir.1996) (quoting *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1462 (9th Cir. 1993)).

requirements to an expert economist's proposed product market definition based on an analysis of the practical indicia identified in *Brown Shoe.* In related contexts, however, several courts have held that, in the absence of additional economic analysis, the relevant product market cannot be defined solely by reference to a single *Brown Shoe* factor. *See* 2 Kalinowsi, *Antitrust Laws and Trade,* § 24.02[2][b], at 24–70 ("Industry recognition of a separate market, alone, does not suffice to establish a submarket."); *id.* at § 24.02[2][a], at 24–67 (the presence of three or four *Brown Shoe* factors is sufficient to define a market); *see also IT & T v. General Tel. & Elecs. Corp.,* 518 F.2d 913, 932 (9th Cir. 1975) (holding district court clearly erred in finding a valid submarket based on only two *Brown Shoe* indicia: industry recognition (including statements by the defendant itself) and distinct customers).

While not directly on point, the Court finds these cases helpful by analogy. In particular, the Court finds that Dr. Phillips' purported analysis of the relevant product market—which focuses almost entirely on a single *Brown Shoe* factor (industry/public recognition), with little relevant analysis of the remaining six factors [17]—is neither sufficiently reliable nor sufficiently helpful to the trier of fact to satisfy Rule 702's requirements.

### (ii) Economic Significance

Moreover, an indispensable component of any market analysis based on the practical indicia identified in *Brown Shoe* is an evaluation of the *economic significance* of these indicia.

Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are "economically significant" in terms of the alleged anticompetitive effect.

*IT & T,* 518 F.2d at 932. Here, Dr. Phillips not only failed meaningfully to consider any *Brown Shoe* indicia other than industry/public recognition, but he also failed to provide any meaningful discussion as to whether and how any such indicia are "economically significant" in this particular case. Instead, Dr. Phillips' analysis of the relevant product market essentially boils down to: plenty of people (including consumers and industry participants) recognize "rock" as a type of music; therefore, the relevant market in this case is comprised of "live rock music concerts." A key ingredient missing from Dr. Phillips' Expert Report, however, is *economic analysis* (be it quantitative or qualitative) tying these statements by industry observers to Dr. Phillips' ultimate conclusion that the relevant market is comprised of "live rock music concerts."

### (c) Cross–Elasticity of Supply

When defining the relevant product market, Dr. Phillips admittedly failed to consider cross-elasticity of supply.

Q. How did you apply the principle of cross-elasticity of supply in your analysis? It's not mentioned in your report, is it?

A. No, it's not.

Q. So how did you apply that principle in this case?

A. Yeah, I didn't give it much thought.

---

17. As discussed above, to the extent that Dr. Phillips addressed the remaining six *Brown Shoe* factors, he did so primarily by reference to product markets (*i.e.,* the market for all live music concerts, or "rock/pop" music concerts) other than what he contends is the relevant product market in this case (*i.e.,* live rock music concerts). Thus, to the extent that this mismatched analysis is relevant to Dr. Phillips' proposed product market definition, it undermines his ultimate conclusion.

(Phillips Depo, at 150:21–151:3). "But defining a market on the basis of demand considerations alone is erroneous. A reasonable market definition must also be based on 'supply elasticity.'" *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir.1995) (internal citations omitted).

In some respects, the "unique production facilities" indicium identified in *Brown Shoe* can be viewed as a proxy for the cross-elasticity of supply.

> [I]f two products can be manufactured with the same or similar equipment, i.e., a manufacturer of one can shift with little expense to production of the other, this is evidence of 'cross-elasticity of supply.' Evidence of cross-elasticity of supply or production flexibility may be adduced to support a broad market definition.

2 Kalinowski, *Antitrust Laws and Trade*, § 24.02[2][f], at 24–77.

As discussed above, however, to the extent that Dr. Phillips considered "unique production facilities," he did so in a manner that undermined his proposed market definition (by focusing on "production inputs" common to *all* live music concerts— or in some cases common to "rock" and "pop" concerts—as opposed to production inputs unique to live *rock* music concerts).

### (d) Definition of the Relevant Market: Conclusion

Dr. Phillips' analysis of the relevant product market: (1) fails to comport with Dr. Phillips' chosen methodology (*i.e.*, the "SSNIP" methodology); (2) is effectively predicated on the analysis of a single *Brown Shoe* factor; and (3) fails to consider the cross-elasticity of supply. Accordingly, the Court finds that this purported definition of the relevant product market is neither sufficiently reliable nor sufficiently helpful to the trier of fact to warrant admission under Rule 702.

### (2) Populating the Relevant Market

■ The Court's discussion in the preceding section focused on Dr. Phillips' opinion that the relevant product market is comprised of "live rock music concerts." This section addresses the means by which Dr. Phillips populated this purported market; i.e., his determination of which artists qualify as "rock" artists and, therefore, which concerts qualify as "rock" concerts, such that they should be included in the market as defined by Dr. Phillips.

As set forth in more detail below, to the extent that Dr. Phillips relied on his own subjective opinion in order to determine which performers qualify as "rock" artists, he is not qualified to make this determination. Further, to the extent that Dr. Phillips purported to rely on "industry information" in order to categorize the artists at issue, he did not utilize a reliable methodology for interpreting and applying this information. Under either view, this testimony is inadmissible under Rule 702 and *Daubert.*

### (a) Opinions Outside of Dr. Phillips' Area of Expertise

In connection with his analysis of the relevant product market, Dr. Phillips made a concert-by-concert determination of whether the performer(s) at issue qualified as "rock" artists. Dr. Phillips, however, has no expertise in this area. Nor can the Court discern any meaningful application of Dr. Phillips' expertise as an economist to these determinations.

When discussing his methodology for defining the relevant market, Dr. Phillips noted, "Indeed, some of what I did was similar to what Live Nation **Music Analyst** Dan Condon testified he did when his work called for him to categorize a particular artist by genre: namely, when a particular artist was not already categorized by the company, he looked to industry

sources like Pollstar." [18] (Phillips Expert Report, at ¶ 62, n. 85 (emphasis added)). Similarly, when asked in his deposition, "Isn't a juror perfectly capable of determining whether Paul McCartney is rock?" Dr. Phillips replied: "Yes, and in fact, the juror may be part of the fan base that has preferences for Paul McCartney or The Rolling Stones or someone else." [19] (Phillips Depo., at 128:22–129:2).

Thus, in determining whether each performer qualified as a "rock" artist, Dr. Phillips was, in his own words, doing the work of a "music analyst" (or perhaps a lay juror). He was not relying on his experience and expertise as an economist. *See* 4 J. McLaughlin, Weinstein's Federal Evidence § 702.04[6], at 702–68.9 (Matthew Bender 2d ed. 2011) ("[E]ven though a proposed witness might possess credentials to render some expert opinions, the trial court may, and perhaps must, exclude on grounds of disqualification any testimony that extends beyond the witness's demonstrated expertise.").

### (b) Unreliable Methodology

Plaintiffs argue that in categorizing the music artists at issue, Dr. Phillips simply relied on the types of materials typically used by experts in his field (consumer surveys, trade publications, etc.). The Court recognizes, as a general matter, that economists are entitled to rely on relevant trade publications and comparable indus-

try materials when conducting an economic analysis of a particular industry. Here, however, the manner in which Dr. Phillips utilized the industry publications upon which he relied—and the corresponding lack of any discernable economic analysis of these materials—render his categorization of music artists unreliable under Rule 702(c) (expert testimony is admissible only where it "is the product of reliable principles and methods").

More specifically, Dr. Phillips categorized each concert that took place during the relevant time period as "rock", "pop" or "other." (*See* Dkt. 405, Yen Decl., Exh. 17; Phillips Depo., at 134:3–25). With respect to this categorization, Dr. Phillips listed a "source" for each artist. (*See id.*). Dr. Phillips' primary source was Billboard. (*Id.* at 139:4–6). Billboard, however, does not categorize artists by genre (e.g., as a "rock" artist).[20] (*Id.* at 139:7–21; 141:16–18). Consequently, Dr. Phillips read the Billboard "bio" for each artist, and made a "subjective determination based upon [his] opinion" as to whether that artist qualifies as a "rock" musician. (*Id.* at 141:19–23). In some cases, additional sources were consulted (*e.g.*, www.allmusic.com), but Dr. Phillips recorded only the "primary" source for each artist in his Report. (*Id.* at 135:5–8). Dr. Phillips decided for himself which source(s) to rely on when categorizing each artist. (*Id.* at 135:2–3). He

18. Under certain circumstances, it would be appropriate for an economist to rely on work performed by a music analyst as a basis for further *economic* analysis. Here, however, Dr. Phillips does not purport to rely on work done by Dan Condon (or any other music analyst). Instead, he categorized artists—i.e., performed the work of a "music analyst"—himself.

19. When asked, "What evidence can you point to supporting your market definition that a member of the jury couldn't do on their own?" Dr. Phillips responded, "Well, if a member of a jury had a Ph.D. in economics

and wanted to immerse themselves in this case for nine or ten years, they'd have a go at it, they'd have a possibility of reaching the same opinions I did." (Phillips Depo., at 128:14–21). With respect to the specific task of categorizing artists as "rock" versus non-"rock", however, Plaintiffs do not argue that a Ph.D. in economics is required (or that Dr. Phillips' background in any way qualifies him to make this determination on his own).

20. From the record before the Court, there does not appear to be any "definitive" industry resource that categorizes artists in this manner.

did not consult a music expert when making this determination.[21] (*Id.* at 143:4–6). *See generally* 4 J. McLaughlin, Weinstein's Federal Evidence § 703.04[3] & n. 26, at 703–19 (under Rule 703, expert may reasonably rely on opinions of other experts).

By way of example, in Dr. Phillips' Expert Report, the "source" listed for Simon & Garfunkel is "Billboard." (*See* Phillips Depo., at 167:7–25). Simon & Garfunkel's Billboard bio refers to the group as "[t]he most successful folk-rock duo of the '60s." (Phillips Depo., at 167:7–9). Dr. Phillips, however, categorized Simon & Garfunkel as "pop," not "rock." (*Id.* at 167:22–25). When asked why, Dr. Phillips responded: "Because considering all of the industry information, they were considered to be more folk than rock." (*Id.* at 168:2–4). Dr. Phillips was unable to specifically identify any such "industry information," nor was it listed in his Report. (*Id.* at 169:4–13).

In effect, Dr. Phillips' explanation for this classification is: I am an economist, I reviewed a large amount of "industry information"—which does not explicitly categorize artists as "rock" versus non-"rock", which is not specifically identified in my Report, and which I am unable specifically to recall—and this industry information supports my conclusion.[22] This "methodology" does not satisfy the requirements of Rule 702 or Rule 703. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 157, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("Of course, [the expert] himself claimed that his method was accurate, but, as we pointed out in *Joiner,* 'nothing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.'") (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

The Court's conclusion may have been different if Billboard, or any other resource identified by Dr. Phillips, provided a comprehensive, objectively-verifiable categorization of music artists. Courts consistently have allowed economists to rely on such data. *See, e.g., Clinchfield R. Co. v. Lynch,* 784 F.2d 545, 553–54 (4th Cir. 1986) (expert entitled to rely on reports of the United States Census Bureau); *see also* 2 Kalinowski, *Antitrust Laws and Trade* § 24.02[2][b] & n. 170, at 24–70 (Industrial classification codes of the U.S. Census Bureau may be used as evidence of "industry or consumer recognition" under *Brown Shoe* ). Here, however, the "industry information" upon which Dr. Phillips purports to rely failed to provide the specific information that he needed, forcing Dr. Phillips to engage in further *non-economic* analysis in order to categorize the artists at issue.

As noted in the Court's prior Class Certification Order, the definition of any product market necessarily will entail some "gray area" around the edges. Here, however, Dr. Phillips applied an unreliable methodology in determining whether every concert at issue in this litigation qualified as a "rock" concert, which should be included in the relevant product market. This unreliable methodology does not merely implicate the "gray area" at the fringes; it fatally undermines Dr. Phillips'

---

**21.** In contrast, Dr. Phillips relied on the assistance of a music expert when performing his market analysis in the *NIPP* litigation, which is discussed further below. (*See* Phillips Depo., at 143:4–144:21).

**22.** Dr. Phillips also contends that Defendants' internal classifications of certain artists sup-

port his conclusions. These internal classifications, however, are similarly ambiguous. (*See, e.g.,* Phillips Depo., at 162:13–63:3 (arguing that Defendants' classification of Madonna as "rock/pop" supports his categorization of Madonna as "rock" instead of "pop")).

definition of the relevant product market in its entirety.

### c. NIPP Litigation

In *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F.Supp.2d 1048, 1082 (D.Colo.2004) ("*NIPP*"), a Denver-based concert promoter brought an antitrust action against Clear Channel Communications, Inc., Clear Channel Broadcasting, Inc. (Defendants in this litigation) and other entities. In that case, Dr. Phillips offered expert testimony regarding several potentially relevant product markets, including the purported market for rock music concerts. *See id.* at 1083. In response to Defendants' motion to exclude Dr. Phillips' testimony, the court held:

> Although Dr. Phillips did not calculate cross-elasticity of demand, he did rely on other economic data, including industry materials, pricing data, and public recognition of the market, all of which have been held relevant to determining the scope of a market. Additionally, Dr. Phillips does not base his opinion on his subjective beliefs but on his research of industry materials regarding the industry's categorization of rock music. Because Dr. Phillips relies on sufficient data and applies that data to define the market, his opinion is sufficiently reliable for admission on the issue of market definition under *Daubert*. The court

elects to refrain from ruling on defendants' motion as to the admissibility of Dr. Phillips' opinion on damages at this time, since [that] decision is not relevant to the summary judgment motion.[23]

*Id.* at 1120. Both Plaintiffs and Dr. Phillips cite the *NIPP* decision in support of their proposed product market definition. The court's decision in *NIPP.* however, is not binding on this Court. Moreover, the *NIPP* case is distinguishable from the instant action in several key respects.

As a preliminary matter, the court in *NIPP* undertook an extensive analysis of Dr. Phillips' proposed market definitions in connection with defendants' motion for summary judgment, followed by a very brief discussion (quoted above) of defendants' motion to exclude Dr. Phillips' testimony under Rule 702. As noted earlier, this Court's analysis proceeds in the reverse order: first, a thorough examination of Dr. Phillips' proffered expert testimony in the Court's role as "gatekeeper" under Rule 702; second, an analysis of Defendants' motions for summary judgment, considering Dr. Phillips' testimony only to the extent that it is admissible under Rule 702. *See Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir.1994).

Furthermore, in *NIPP.* Dr. Phillips relied on the assistance of a music expert in performing his market analysis. In this case, no music expert was retained.[24] (*See*

---

**23.** While the *NIPP* court declined to rule on the admissibility of Dr. Phillips' opinion on damages, its brief discussion of this issue in connection with defendants' motion for summary judgment supports this Court's analysis of Dr. Phillips' damages calculations (discussed above):

> To the extent that NIPP argues that Clear Channel's prices are above industry average based on a comparison between average ticket prices charged in a given year by Clear Channel versus average ticket prices charged by other promoters, Clear Channel is correct that NIPP's failure to consider the different costs born by Clear Channel is

fatal to NIPP's argument. If Clear Channel promotes all of the most expensive, top artists, Clear Channel's ticket prices will be higher than tickets sold by other promoters, and this price difference does not indicate monopolistic pricing or conduct.

*NIPP*, 311 F.Supp.2d at 1100–01.

**24.** In connection with his Expert Report submitted in this case, Dr. Phillips lists "NIPP" as the source for his classification of certain music artists. (*See* Yen Decl., Exh. 17). Presumably, the music expert in *NIPP* assisted Dr. Phillips in classifying these artists. Given the relatively small number of artists for

Phillips Depo., at 143:4–144:21 (discussing the use of a music expert in *NIPP,* but not in this litigation)).

Moreover, in evaluating the plaintiff's proposed product market in *NIPP.* the court relied, in part, on a pricing comparison in which "Dr. Phillips set[ ] forth average ticket prices for both rock, rock-pop, and all music concerts." *NIPP,* 311 F.Supp.2d at 1084. Here, Dr. Phillips cites no such comparative-pricing analysis in support of his proposed product market definition (nor does Plaintiff argue that Dr. Phillips' proposed product market definition is based on any such analysis).[25] Instead, in defining the relevant product market, Dr. Phillips compared the average price of live music concerts generally to entirely different forms of entertainment (e.g., movies). (*See* Phillips Expert Report, at ¶ 60).

Notably, the plaintiffs in *NIPP* argued in support of multiple relevant product markets, leading the court to conclude, "Alternatively, a reasonable jury could surely find that NIPP has set forth evidence of practical indicia showing a distinct market for all live music concerts." *NIPP,* 311 F.Supp.2d at 1084. Here, in contrast, the only relevant product market argued by Plaintiffs is the purported market for live rock music concerts.

The court in *NIPP* concluded that plaintiff raised a triable issue of fact with respect to cross-elasticity of supply. *See NIPP,* 311 F.Supp.2d at 1085. Here, Dr. Phillips conceded that he did not consider cross-elasticity of supply in his analysis.

Finally, the court's decision in *NIPP* did not address the *methodology* employed by Dr. Phillips, which is the focus of this Court's analysis under Rule 702. The methodology employed by Dr. Phillips in *NIPP* differed in at least one material respect from the methodology employed here, namely, the use of a music expert to categorize artists by music type. Because the court in *NIPP* did not further elaborate on its *Daubert* findings, this Court is unable to discern whether Dr. Phillips' methodology in that case differed in other material respects as well.

#### d. Definition of the Relevant Market: Conclusion

The Court finds that Dr. Phillips' Expert Report fails to satisfy Rule 702's requirements in both: (1) defining the relevant product market; and (2) populating this market for purposes of his analysis. Accordingly, Plaintiffs have failed to meet their burden of demonstrating that Dr. Phillips' opinion regarding the definition of the relevant product market is admissible under Rule 702.

#### 3. Defendants' Market Share & Exclusionary Conduct

Finally, Defendants argue that the Court should exclude Dr. Phillips' opinions regarding Defendants' share of the relevant market and Defendants' allegedly anticompetitive conduct. The gravamen of Defendants' arguments as to this testimony, however, is not that Dr. Phillips is unqualified to offer opinions on these matters (or that his methodology is so flawed as to warrant exclusion under Rule 702). Instead, Defendants argue that Dr. Phil-

which Dr. Phillips lists "NIPP" as the source, however, his prior use of a music expert in *NIPP* does not materially affect the Court's analysis in this case.

**25.** Nor has the Court located any such analysis in the voluminous record. *See generally Carmen,* 237 F.3d at 1029 ("A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for such evidence.").

lips' opinions on these issues are insufficient, as a matter of law, to support Plaintiffs' antitrust claims. Accordingly, these arguments are not amenable to analysis under Rule 702, but instead should be analyzed under the summary judgment standard.

## V. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. Cnty. of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may satisfy its Rule 56(c) burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–24, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir.2000). Only 'genuine disputes over facts that might affect the outcome of the suit under the governing law, i.e., "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party," will properly preclude the entry of summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Under Local Rules 56–2 and 56–3, these triable issues of fact must be identified in the non-moving party's "Statement of Genuine Issues" and supported by "declaration or other written evidence." *See also Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 779 (9th Cir.2010) ("Federal Rule of Civil Procedure 56(e)(2) requires a party to "set out specific facts showing a genuine issue for trial."). If the non-moving party fails to identify the triable issues of fact, the court may treat the moving party's evidence as uncontroverted, so long as the facts are "adequately supported" by the moving party. Local Rule 56–3; *see also International Longshoremen's Ass'n, AFL–CIO v. Davis*, 476 U.S. 380, 398 n. 14, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986) ("[I]t is not [the Court's] task *sua sponte* to search the record for evidence to support the [parties'] claim[s]."); *Carmen v. San Francisco United School District*, 237 F.3d 1026, 1029 (9th Cir.2001) ("A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for such evidence.").

### B. Sherman Act Claims

Defendants argue that summary judgment is warranted based, *inter alia*, on Plaintiffs' failure to raise a triable issue of fact as to the relevant product market.

"As long held by the Supreme Court, proof of a relevant market is an essential element of a Section 2 monopolization and attempted monopolization case." 2 Kalinowski, *Antitrust Laws and Trade*, § 24.01[3][a], at 24–5, 24–6 (citing *Spec-*

*trum Sports v. McQuillan,* 506 U.S. 447, 457, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) ("[I]t is beyond doubt that [a monopolization claim under Sherman Act § 2] requires proof of market power in a relevant market."); *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. 884 ("[P]etitioners may not be liable for attempted monopolization under § 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market[.]")).

For the reasons set forth above, Dr. Phillips' testimony regarding the relevant product market is inadmissible under Rule 702. Plaintiffs do not argue (nor does the Court conclude) that there is an adequate evidentiary basis in the record, absent Dr. Phillips' testimony, for a jury to find that Plaintiffs have defined an economically significant product market. *See IT & T,* 518 F.2d at 932. Accordingly, summary judgment is appropriate with respect to Plaintiffs' claims of monopolization and attempted monopolization in the Denver and Los Angeles markets. *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1380 (9th Cir.1989) (affirming district court's order granting summary judgment, where plaintiff failed to raise a triable issue of fact as to its proposed product submarket definition); *Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev., Inc.,* 371 Fed.Appx. 719, 721 (9th Cir.2010) (affirming summary judgment as to plaintiff's claim under Sherman Act § 2, where the district court excluded under Rule 702 significant portions of the declarations of plaintiff's proffered experts).

 In rare instances, a claim under the Sherman Act may succeed absent a specifically-defined product market.

> [D]ispensing with market definition and relying on direct evidence [of anticompetitive behavior] might be appropriate in cases involving highly suspicious restraints, such as horizontal agreements examined under the "quick look" rule of

reason. For all other restraints, however, a relevant market must be shown.

2B Areeda & Hovenkamp, *Antitrust Law,* ¶ 531, at 241 (citing *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.,* 381 F.3d 717, 736–39 (7th Cir.2004)).

Here, however, Plaintiffs do not argue that Defendants' conduct was so "highly suspicious" that it can support an antitrust claim absent a properly-defined product market. Nor do they argue that Defendants' alleged anticompetitive behavior may be evaluated under a "quick look" analysis. Instead, Plaintiffs contend that Defendants' activities, even if lawful when viewed in isolation, amount to a violation of the Sherman Act when considered in their entirety. (*See generally* MSJ Opposition (Denver), at 9–11 (arguing that Defendants' conduct must be evaluated as a whole)). Accordingly, this action does not involve the rare circumstances under which a Sherman Act claim may succeed absent a viable definition of the relevant product market.

Accordingly, Defendants' Motions for Summary Judgment are GRANTED with respect to Plaintiffs' claims for monopolization and attempted monopolization under Section 2 of the Sherman Act (in the Denver and Los Angeles markets). Based on the Court's conclusion that summary judgment is warranted based on Plaintiffs' failure adequately to define the relevant product market, the Court need not address Defendants' remaining arguments as to the merits of Plaintiffs' antitrust claims.

## C. Unjust Enrichment Claims

Plaintiffs' claims of unjust enrichment are predicated entirely on their Section 2 claims. Accordingly, Defendants' Motions for Summary Judgment are GRANTED with respect to Plaintiffs' claims of unjust enrichment.

## VI. REMAINING MOTIONS

The Court hereby DISMISSES AS MOOT Defendants' Motion for Class Decertification (as to Case Nos. 2:05–CV–06704 (Los Angeles market) and 2:06–CV–04987 (Denver market)), (Dkt. 410); Plaintiffs' Motion for Approval of Plan for Class Notice, (Dkt. 460); Plaintiffs' Motion to Exclude the "Affinity Analysis" of Dr. Janusz Ordover, (Dkt. 469); and Plaintiffs' Motion to Strike Declaration of Julia Vander Ploeg, (Dkt. 516).

## VII. FURTHER BRIEFING

The parties are hereby ORDERED promptly to meet and confer and to submit a joint stipulation as to how best to proceed with the remaining MDL actions before this Court within twenty-one (21) days of the date of this Order.

IT IS SO ORDERED.